# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: July 26, 2017

**NO. 34,999**

**RENZENBERGER, INC.,**

 Plaintiff-Appellant,

v.

**STATE OF NEW MEXICO TAXATION
AND REVENUE DEPARTMENT,**

 Defendant-Appellee.


**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY
David K. Thomson, District Judge**


Betzer, Roybal & Eisenberg, P.C.
Benjamin C. Roybal
Albuquerque, NM

Sanchez, Mowrer & Desiderio, P.C.
Robert J. Desiderio
Albuquerque, NM

for Appellant

Hector H. Balderas, Attorney General
New Mexico Taxation and Revenue Department
Elena Romero Morgan, Special Assistant Attorney General
Santa Fe, NM

for Appellee

Multistate Tax Commission
Helen Hecht, General Counsel
Bruce Fort, Counsel
Washington, D.C.

Amicus Curiae

**OPINION**

**WECHSLER, Judge.**

{1}    We determine in this appeal that a taxpayer's transport as a motor carrier of an interstate railroad's employees from point to point in New Mexico is not "transportation of a passenger traveling in interstate commerce by motor carrier" in order to preempt New Mexico gross receipts tax under a federal statute, 49 U.S.C. § 14505(2) (2012). We therefore affirm the district court's summary judgment denying a refund of taxes paid.

**BACKGROUND**

{2}    Renzenberger, Inc. (Taxpayer) contracted with Union Pacific Railroad and Burlington Northern Santa Fe (the railroads) to transport railroad employees to and from railroad trains both within New Mexico and from New Mexico to another state.[1] The railroads carried freight across state lines in the United States. Taxpayer asserted that its service was necessary because interstate railroad carriers needed to comply with federal safety regulations and union rules concerning crew hours and that Taxpayer's service enables railroads to "provide relief services to allow the railroads to continue to operate without undue delay."

---

[1]Taxpayer also provided other services that are not material to this opinion.

{3}     Defendant State of New Mexico Taxation and Revenue Department (the Department), after an audit, assessed Taxpayer for gross receipts tax, penalties, and interest for the period from March 31, 2005 through August 31, 2010. The Department assessed liability only for gross receipts tax on revenue derived from transportation between locations in New Mexico, not for transportation from a location in New Mexico to a location in another state. Taxpayer timely paid the assessed liability, penalties, and interest in full and filed an application for refund with the Department for the amounts paid. The Department denied the application, and Taxpayer filed a complaint for tax refund in the First Judicial District Court.

{4}     In the district court, the parties filed cross-motions for summary judgment. After a hearing, the district court denied Taxpayer's motion and granted the Department's motion.

**49 U.S.C. § 14505**

{5}     In 1995, Congress passed the Interstate Commerce Commission Termination Act (the ICCTA) with the intent of deregulating certain industries. 49 U.S.C. §§ 101-80504 (2012). Within the ICCTA, Congress enacted 49 U.S.C. § 14505 to restrict states and local subdivisions from burdening interstate passenger travel by motor carrier. Title 49 U.S.C. § 14505 reads:

> A State or political subdivision thereof may not collect or levy a tax, fee, head charge, or other charge on—

2

> (1) a passenger traveling in interstate commerce by motor carrier;
>
> (2) the transportation of a passenger traveling in interstate commerce by motor carrier;
>
> (3) the sale of passenger transportation in interstate commerce by motor carrier; or
>
> (4) the gross receipts derived from such transportation.

In recognition of the Supremacy Clause of the United States Constitution, the New Mexico Legislature enacted NMSA 1978, Section 7-9-55(A) (1993), providing that "[r]eceipts from transactions in interstate commerce may be deducted from gross receipts to the extent that the imposition of the gross receipts tax would be unlawful under the United States [C]onstitution."

{6}     There is no question in this case that the Department deducted receipts from Taxpayer's service revenues that included transportation between locations in New Mexico and locations in other states. The issue of this appeal is, rather, whether 49 U.S.C. § 14505 preempts the Department's assessment of gross receipts tax on the revenues from Taxpayer's service between locations in New Mexico. If 49 U.S.C. § 14505 applies, Taxpayer would have been entitled to also deduct revenues for transportation between locations in New Mexico.

**STANDARD OF REVIEW**

{7}     Because the outcome of this appeal depends on our interpretation of 49 U.S.C. § 14505, and because the district court made its interpretation by way of summary

3

judgment, we review the district court's ruling de novo. *See Maestas v. Zager*, 2007-NMSC-003, ¶ 8, 141 N.M. 154, 152 P.3d 141. When interpreting a statute, our primary goal is to give effect to the legislative intent. *Key v. Chrysler Motors Corp.*, 1996-NMSC-038, ¶ 13, 121 N.M. 764, 918 P.2d 350. We endeavor to do so by first examining the plain language of the statute. *Marbob Energy Corp. v. N.M. Oil Conservation Comm'n*, 2009-NMSC-013, ¶ 9, 146 N.M. 24, 206 P.3d 135. "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). If there is an ambiguity or a lack of clarity, we will turn to other aspects of statutory construction, including the purpose of the statute and its legislative history. *See Marbob*, 2009-NMSC-013, ¶ 9.

{8}     Additionally, because we are interpreting a federal statute that is designed to preempt state taxation, the United States Supreme Court has indicated that the party advocating preemption has the burden of demonstrating the congressional intent "to supplant state law." *De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 814 (1997) (internal quotation marks and citation omitted). The Court has recognized in such cases that principles of federalism support state sovereignty with regard to its taxing authority and has applied a "presumption against pre-emption"

4

that requires "the clear and manifest purpose of Congress" for preemption. *Id.* at 813 n.8 (internal quotation marks and citation omitted); *Dep't of Revenue of Or. v. ACF Indus., Inc.*, 510 U.S. 332, 344-45 (1994).

{9}     The parties dispute the import of this presumption in this case. While the Department and Amicus Curiae Multistate Tax Commission advance the use of the presumption, Taxpayer asserts that the United States Supreme Court "is currently split as to the existence of a presumption against preemption[,]" and, regardless, if there is such a presumption in this case, it only means that "Taxpayer has the burden of persuading [this] Court that, as a matter of law, the unambiguous language" of 49 U.S.C. § 14505 prohibits the imposition of the tax at issue.

{10}     We need not address either the existence or the scope of this federal presumption because we apply a similar presumption concerning the interpretation of state-established exemptions and deductions. In *Security Escrow Corp. v. New Mexico Taxation & Revenue Department*, 1988-NMCA-068, ¶ 8, 107 N.M. 540, 760 P.2d 1306, we stated that "[w]here an exemption or deduction from tax is claimed, the statute must be construed strictly in favor of the taxing authority, the right to the exemption or deduction must be clearly and unambiguously expressed in the statute, and the right must be clearly established by the taxpayer." We see no reason to not

employ such a construction in considering whether our state statute is preempted by federal law.

**STATUTORY INTERPRETATION ANALYSIS**

{11}     The focus of our statutory interpretation inquiry is the language of Subsection 2 of 49 U.S.C. § 14505, "a passenger traveling in interstate commerce by motor carrier[.]" The phrases "traveling in interstate commerce" and "by motor carrier" and the word "passenger" all have bearing on our analysis. We first turn to the phrase "traveling in interstate commerce," and we subsequently address the use of the phrase "by motor carrier" and the word "passenger."

**"Traveling in Interstate Commerce"**

{12}     The district court interpreted "traveling in interstate commerce" to require "at the very least . . . trips across a state line by motor carrier carrying passengers[.]" Taxpayer advances a broader approach. According to Taxpayer, the statutory language "in interstate commerce" includes "all activities that have a substantial affect on interstate commerce, including activities that are solely intrastate." Under Taxpayer's approach, 49 U.S.C. § 14505 preempts even Taxpayer's transportation of railroad crew members from point to point in New Mexico from New Mexico gross receipts taxation because the transportation is "in interstate commerce" as an integral part of the railroads' activity in interstate commerce.

## A. Effect on Commerce

{13}     Taxpayer relies on *United States v. Yellow Cab Co.*, 332 U.S. 218 (1947), *overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984). *Yellow Cab* involved a complaint alleging violations of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2 (2004), which prohibits "unreasonable restraints on interstate commerce[.]" *Yellow Cab*, 332 U.S. at 225; *see* 15 U.S.C. § 1 ("Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several [s]tates, or with foreign nations, is declared to be illegal."). As pertinent to this case, in *Yellow Cab*, there were allegations of a conspiracy to restrict competition for contractual taxicab services to transport interstate railroad passengers with their luggage from one railroad station to another within Chicago. 322 U.S. at 228. Stating that such transportation was "clearly a part of the stream of interstate commerce" and "an integral step in the interstate movement[,]" the Supreme Court held that the service was subject to the Sherman Act. *Id.* at 228-29.

{14}     Taxpayer has expanded on the language of *Yellow Cab* to advance an even broader scope of "in interstate commerce" because *Yellow Cab* was a Sherman Antitrust Act case. The United States Supreme Court has consistently held that federal jurisdiction under the Sherman Antitrust Act may be invoked if the activity

7

involved substantially affects interstate commerce. *See, e.g.*, *McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 242 (1980) ("It can no longer be doubted, however, that the jurisdictional requirement of the Sherman Act may be satisfied under either the 'in commerce' or the 'effect on commerce' theory."); *Hosp. Bldg. Co. v. Tr. of Rex Hosp.*, 425 U.S. 738, 743 (1976) ("As long as the restraint in question substantially and adversely affects interstate commerce, the interstate commerce nexus required for Sherman Act coverage is established." (internal quotation marks and citations omitted)). Taxpayer has therefore interpreted the phrase "in interstate commerce" to embrace any activity that affects interstate commerce. According to Taxpayer, it is the generally accepted use of the phrase such that "it is axiomatic throughout the entire gambit of commerce clause jurisprudence that 'in interstate commerce' captures any activity . . . that affects or is an integral part or provides necessary support to interstate commerce."

{15}     We do not disagree with Taxpayer that the Commerce Clause of the United States Constitution permits Congress to regulate intrastate activity that substantially affects or performs an integral part of, interstate commerce. We also do not disagree with Taxpayer that the facts Taxpayer asserts as to its service may well have such an effect on the railroads' interstate transportation. We part company with Taxpayer, however, with regard to its contention that commerce clause jurisprudence requires

an analysis of the effect on interstate commerce whenever Congress uses the term "in interstate commerce," as it has done in 49 U.S.C. § 14505.

{16}    The United States Supreme Court has taken two differing approaches. On the one hand, the United States Supreme Court has recognized a distinct difference between the ways in which Congress chooses to create federal jurisdiction through the use of its commerce clause authority. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001) ("Congress uses different modifiers to the word 'commerce' in the design and enactment of its statutes."). Over time, as Taxpayer has intimated, the different terms Congress has used have become terms of art. *See Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 273 (1995) (stating that the words "in commerce" are "words of art"); *United States v. Am. Bldg. Maint. Indus.*, 422 U.S. 271, 280 (1975) (recognizing the term "engaged in commerce" as a "term of art"), *superseded by statute on other grounds as stated in United States v. Gillies*, 851 F.2d 492, 493 (1st Cir. 1988).

{17}    In construing Congress's language in connection with its use of its commerce clause power, the Supreme Court has understood the terms "affecting interstate commerce" and "involving interstate commerce" to mean that Congress is exercising the full extent of its commerce clause power in the breadth of the activity it intends to embrace. *See Circuit City*, 532 U.S. at 115 ("The phrase 'affecting commerce'

9

indicates Congress['s] intent to regulate to the outer limits of its authority under the Commerce Clause."); *Allied-Bruce Terminix*, 513 U.S. at 273-74 (stating that the term "affecting commerce . . . normally signals Congress['s] intent to exercise its Commerce Clause powers to the full" and concluding that " 'involving' is . . . the functional equivalent of 'affecting' ").

{18}     On the other hand, the United States Supreme Court has held that Congress's use of the terms "in interstate commerce" and "engaged in commerce" means that Congress intends to use a more limited extent of its commerce power. In *American Building Maintenance*, for example, the Court directly addressed the question of whether the phrase "engaged in commerce" included activities that substantially affect interstate commerce. 422 U.S. at 275. The statute involved was Section 7 of the Clayton Act, 15 U.S.C. § 18 (1950), which prohibited certain acquisitions by a corporation "engaged in commerce." *Am. Bldg. Maint.*, 422 U.S. at 275. The Court rejected the argument of the United States that, like the Sherman Act, the Clayton Act should be interpreted to "be coextensive with the reach of congressional power under the Commerce Clause[,]" stating that, at the time the Clayton Act was re-enacted in 1950, "the phrase 'engaged in commerce' had long since become a term of art, indicating a limited assertion of federal jurisdiction." *Id.* at 277-80; *but see United States v. Darby*, 312 U.S. 100, 109 n.1, 117-18, 123 (1941) (holding, in 1941, that

conduct that had the necessary effect on interstate commerce fell within Congress's commerce clause authority under the Fair Labor Standards Act, 29 U.S.C. § 202 (1938), encompassing "industries engaged in commerce or in the production of goods for commerce"). Congress subsequently amended Section 7 of the Clayton Act to expand its coverage to activities "affecting commerce." *Gillies*, 851 F.2d at 493 (citing 1980 U.S. Code Cong. & Ad. News 2732, which explained that "[t]he purpose of [the amendment] is . . . to apply the antimerger provisions of the Clayton Act to firms whose activities are 'in commerce' or 'affect' interstate commerce").

**B.    In Commerce**

{19}    The extent of federal jurisdiction when Congress uses the phrase "in commerce," however, is not as clear as when it exercises its full authority. And, as stated by the United States Supreme Court, the phrase does not "necessarily have a uniform meaning whenever used by Congress." *Am. Bldg. Maint.*, 422 U.S. at 277. The Court has, nonetheless, interpreted the phrase to be "only persons or activities within the flow of interstate commerce." *Id.* at 276 (internal quotation marks and citation omitted); *Allied-Bruce Terminix*, 513 U.S. at 273. And, it has further defined the flow of interstate commerce as "the practical, economic continuity in the generation of goods and services for interstate markets and their transport and distribution to the consumer." (internal quotation marks and citation omitted); *Am.*

11

*Bldg. Maint.*, 422 U.S. at 276. Of course, "interstate" means movement "[b]etween two or more states." *Black's Law Dictionary* 896 (9th ed. 2009).

{20} Taxpayer also argues, in connection with its argument that its service is in interstate commerce because it "affects" commerce, that the phrase "in commerce" includes activity that, although intrastate, is "integral or necessary to" interstate commerce. Taxpayer states: "The well-defined body of law is explicit that the statutory phrase 'in interstate commerce' includes activity that is solely intrastate so long as that activity substantially affects, or is integral or necessary to, interstate commerce." In support of its contention, Taxpayer cites *Yellow Cab* and the unreported decision *Brown's Crew Car of Wyoming LLC v. Nevada Transportation Authority*, No. 2:08-CV-00777-RLH-LRL, 2009 WL 1240458 (D. Nev. May 1, 2009).

{21} In *Yellow Cab*, the Supreme Court held that pre-arranged transportation of interstate passengers and their luggage between railroad stations within Chicago was "part of the stream of interstate commerce." 332 U.S. at 228. The Court reached that conclusion because the passengers were moving from "a point of origin in one state to a point of destination in another," and the fact that there was a link within one state did not alter the interstate nature of the entire journey. *Id.* It viewed the intrastate link as an "integral step in the interstate movement." *Id.* at 229.

{22} The *Yellow Cab* Court also considered another allegation concerning a conspiracy to control the market to transport interstate travelers to and from the travelers' homes, offices, and hotels to railroad stations in Chicago. *Id.* at 230. The Court concluded that such transportation was "too unrelated to interstate commerce" to fall within the authority of the Sherman Antitrust Act. *Id.* It reasoned that the service (1) did not cross state lines, (2) was not limited to railroad passengers, (3) did not involve a contractual or other arrangement with the railroads, and (4) did not involve "fares paid or collected as part of the railroad fares." *Id.* at 230-31.

{23} Despite Congress's broad authority to regulate activity that has an affect on commerce under the Sherman Act, *Yellow Cab*'s holding—that the intrastate link was "integral" to "the interstate movement"—implies that a narrower application of Congress's authority to regulate commerce would have been sufficient under the circumstances. *Id.* at 229; *see Am. Bldg. Maint.*, 422 U.S. at 276 (interpreting the phrase "in commerce" to be "only persons or activities within the flow of interstate commerce" (internal quotation marks and citation omitted)). Taxpayer's service, however, does not cover a step in the interstate journey of the railroads or the freight that they carry. While we agree that Taxpayer's service may affect interstate commerce provided by the railroads, it does not provide the direct link in the stream of commerce as addressed in *Yellow Cab*.

13

{24} In *Brown's Crew Car*, a federal district court held that a service like the one provided by Taxpayer was "in interstate commerce" and therefore outside of the jurisdiction of a state regulatory body. 2009 WL 1240458 at *3, 13. It relied on *Yellow Cab*, reasoning that the carrier (1) operated under a contract with an interstate railroad without providing service to the public and (2) was an integral part of the railroad's interstate activity. *Brown's Crew Car*, 2009 WL 1240458 at *13. The issue in *Brown's Crew Car*, however, did not involve an interpretation of 49 U.S.C. § 14505 but rather the more general question of whether a state had regulatory authority with respect to a party's activities. In this appeal, Taxpayer limits its argument to the effect of 49 U.S.C. § 14505; it does not make any constitutional or other federalism arguments.

{25} Title 49 U.S.C. § 14505(2) preempts the Department from imposing a gross receipts tax on "the transportation of a passenger traveling in interstate commerce by motor carrier[.]" By virtue of the United States Supreme Court's interpretation of the phrase "in interstate commerce," we interpret Congress's intent in 49 U.S.C. § 14505 to address only "the flow of interstate commerce." *Am. Bldg. Maint.*, 422 U.S. at 276. Taxpayer's arguments that its service falls within 49 U.S.C. § 14505 because it affects interstate commerce is contrary to long-standing United States Supreme Court precedent. We do not foreclose, however, that a service that is "integral" to interstate

14

commerce could be considered to be in the flow of commerce under certain circumstances.

**"Passenger" Traveling "by Motor Carrier"**

{26}     We thus turn to the word "passenger" and the phrase "by motor carrier" as Congress has used them in 49 U.S.C. § 14505. The district court held that the crew members Taxpayer transported were not "passengers" under 49 U.S.C. § 14505. Taxpayer disagrees, contending that (1) its service falls within the preemption of Subsection 2 because the crew members, although not passengers of the railroads, are its passengers[2] and (2) although the railroads are not motor carriers, Taxpayer is a motor carrier under the statute.[3] As demonstrated by the parties' competing

_____

[2]Taxpayer also contends that the Department does not interpret "passengers" differently because the Department did not separately assess gross receipts tax on Taxpayer's transport of crew members from points in New Mexico to points in other states, which action it could have taken if the crew members were not " 'passengers' . . . within the plain meaning of Section 14505." The Department asserts that Taxpayer "misunderst[ood] the fact that [the] Department has no authority to tax interstate travel." The parties have not further briefed their contentions, and we do not consider the Department's action regarding service other than the one before this Court.

[3]"Motor carrier" is defined in Part B of the ICCTA, which includes 49 U.S.C. § 14505, as "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(14) (2012). The statutory definition of "motor vehicle" does not include rail transportation. *See id.* at § 13102(16) ("The term 'motor vehicle' means a vehicle, machine, tractor, trailer, or semitrailer propelled or drawn by mechanical power and used on a highway in transportation, or a combination determined by the Secretary, but does not include a vehicle, locomotive, or car operated only on a

15

interpretations, ambiguity exists with respect to the meaning of both the word "passenger" and the phrase "by motor carrier" in 49 U.S.C. § 14505. We therefore look to the context in which the terms are used, the purpose of 49 U.S.C. § 14505, and its legislative history. *Thompson v. Dehne*, 2009-NMCA-120, ¶ 15, 147 N.M. 283, 220 P.3d 1132.

{27} Congress enacted 49 U.S.C. § 14505 in order to overrule a then-recent United States Supreme Court opinion, *Oklahoma Tax Commission v. Jefferson Lines, Inc.*, 514 U.S. 175, 177, 199 (1995), which permitted a state tax on bus tickets for interstate bus travel. *See* H.R. Rep. No. 104-311, at 120 (1995) (stating the purpose of the legislation as prohibiting "a [s]tate or political subdivision of a [s]tate from levying a tax on bus tickets for interstate travel"); H.R. Rep. No. 104-422, at 220 (1995) (Conf. Rep.), *as reprinted in* 1995 U.S.C.C.A.N. 850 (stating that the legislation "reverses a recent Supreme Court decision permitting [s]tates [to levy a tax on bus tickets for interstate travel] and conforms taxation of bus tickets to that of airline tickets"); S. Rep. No. 104-176, at 48 (1995) ("This provision is intended to override a recent court decision permitting such a tax."). *Jefferson Lines* upheld an Oklahoma sales tax on the full value of bus tickets sold in Oklahoma for travel from Oklahoma to other states. 514 U.S. at 178, 200.

---

rail[.]").

{28} The purpose of 49 U.S.C. § 14505, therefore, was to address taxation of interstate travel by bus passengers—passengers who had purchased tickets to travel between states. *See Tri-State Coach Lines, Inc. v. Metro. Pier & Exposition Auth.*, 732 N.E.2d 1137, 1147 (Ill. App. Ct. 2000) (finding that Congress's "exclusive focus in enacting [49 U.S.C. §] 14505 was to ensure that the tickets for interstate city-to-city bus trips, trips often passing through multiple states and having minimal contact with the state of their origin, were not taxed by the originating state in a manner disproportionate to the benefits received in that state"). It did not relate to passengers who, like the railroad crew members, were not "passengers" before and after they were transported within a single state by a motor carrier. In addition, as a preemption exclusively applying to state taxation and charges, it did not relate to persons who, like the railroad crew members, did not generate revenues for the entity traveling in interstate commerce that could be subject to state taxation.

{29} Furthermore, "passenger" is used in conjunction with, and juxtaposed to, "traveling in interstate commerce." 49 U.S.C. § 14505(2). "[W]hen interpreting an unclear or ambiguous term within a statute, we look to the neighboring words in a statute to construe the contextual meaning of a particular word in the statute." *State v. Jimenez*, 2017-NMCA-039, ¶ 33, 392 P.3d 668 (alteration, internal quotation marks, and citation omitted), *cert. denied* (No. 36,346 Apr. 6, 2017). The interstate

17

commerce involved is that of the railroads. If the crew members were "passengers" of the railroads, *Yellow Cab* would suggest that they were traveling in interstate commerce. The crew members were not, however, "passengers" of the railroads under a *Yellow Cab* analysis, and Taxpayer does not contend that they were.

{30}   For similar reasons, Taxpayer's argument that its own status as a motor carrier triggers application of 49 U.S.C. § 14505 is unavailing. Taxpayer's transportation of railroad crew members is not part of ticketed travel between states, a circumstance that places its business activity outside the scope of *Jefferson Lines* and 49 U.S.C. § 14505.

{31}   Taxpayer argues that the original purpose of 49 U.S.C. § 14505 does not limit the reach of the statute as it was enacted. The purpose of the statute, however, is pertinent to the interpretation of the manner in which Congress used the language it selected. The congressional purpose of correcting the *Jefferson Lines* decision comports with the reading that Congress intended to address passengers of a motor carrier who were traveling as passengers in interstate commerce.

{32}   With this understanding of Congress's intent, the railroad crew members are not "passenger[s] traveling in interstate commerce traveling by motor carrier" within the purpose of 49 U.S.C. § 14505(2). Moreover, if the crew members were not "passengers traveling in interstate commerce," it necessarily follows that Taxpayer's

18

activity is not an integral part of the flow of commerce that Congress addressed in 49 U.S.C. § 14505.

**CONCLUSION**

{33} Taxpayer's transportation of railroad crew members from point to point in New Mexico was not "transportation of a passenger traveling in interstate commerce by motor carrier" under 49 U.S.C. § 14505. As a result, 49 U.S.C. § 14505 does not preempt the Department from collecting gross receipts tax assessed on Taxpayer's receipts from providing such service. We affirm the district court's ruling denying Taxpayer a refund of taxes paid.

{34} **IT IS SO ORDERED.**

_____
**JAMES J. WECHSLER, Judge**

**WE CONCUR:**

_____
**LINDA M. VANZI, Chief Judge**

_____
**J. MILES HANISEE, Judge**